# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

_____

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) No. 2:10-cr-20216-JTF |
| | ) |
| **JERRY HUDDLESTON.** | ) |
| | ) |
| **Defendant.** | ) |

_____

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

_____

Defendant Jerry Huddleston, has filed a motion asking this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his release, relying on the threat posed by the COVID-19 pandemic and the fact he has asthma. The United States respectfully opposes the motion. This Court should deny the motion with prejudice because Defendant has not met his burden of establishing that a sentence reduction is warranted under the statute.

### FACTUAL BACKGROUND

On May 20, 2010 Huddleston, along with two co-defendants, was indicted on 9 counts (of a 10 count indictment): four counts of aiding and abetting robbery affecting interstate commerce (Hobbs Act Robbery) in violation of 18 USC §1951 and §2. (Counts 1, 3, 5and 7); four counts of knowingly using and carrying a firearm during and in relation to Hobbs Act Robbery in violation of 18 U.S.C. §924(c) (Counts 2, 4, 6, and 8); and one count of being a convicted felon in possession of a firearm in violation of 18 U.S.C.§922 (g) (R. 1, Page ID 1 ).

On June 28, 2011, Huddleston pleaded guilty to Counts 2, 3, 5, 7, and 9 pursuant to Fed. R. Crim P. 11(c)(1)(C). Both parties recommended the Court impose a sentence of 300 months. (*See* Plea Agreement, R. 89, Page ID. 123).

Counts 1 and 2 involved the robbery of a BP station in Jackson, Tn. On January 23, 2010, at approximately 10:20 p.m., two men S.B. and M. A. were working at the BP when Jerry Huddleston entered the business, armed with a firearm and wearing a ski mask. Huddleston grabbed Mr. A. and demanded Mr. B.to give him the money from the cash register. Huddleston threatened to shoot Mr. A. on the count of ten and began counting. Huddleston also struck Mr A. in the face with the gun. Mr. B. gave Huddleston the money from the register and he quickly fled the scene in a car driven by a co-defendant. (PSR, Paragraph 4)0

Counts 3 and 4 involved the robbery of a Mega Mart also located in Jackson. On January 26, 2010 at approximately 9:15 p.m. the female victim, D.C. was working when Huddleston entered the business with a firearm while wearing a face mask. He pointed the gun at the victim and demanded money. He fired one round in the business before taking money from the cash register and fleeing the scene in a car driven by a co-defendant. (PSR, Paragraph 5).

Counts 5 and 6 involve the robbery of the Little General, another business in Jackson. On January 24, 2010, at approximately 9:44, the two victims, A.H. (male) and S.S. (female) were working when Huddleston entered the business, armed with a firearm and wearing a ski mask. He pointed the firearm at both victims and demanded money. He took money from the business and fled the business in a waiting getaway car being driven by a co-defendant. (PSR, Paragraph 6).

Counts 7, 8, and 9 involve the robbery of a Shell Station on January 26, 2010 in Bartlett, TN. At approximately 9 pm two employees, both male, J. G. and J. T., were working when Huddleston entered the business with a firearm and wearing a ski mask. After firing a round in the

business, he placed a gun to Mr. G's head and demanded money. After taking money from the cash register he fled the business in a car driven by a co-defendant. A witness saw the car and gave a description to the investigators with the Bartlett Police Department. The police officers observed the car and attempted to get it to stop. A chase for over 20 moles ensued until the defendant's vehicle crashed. The co-defendant who was driving was still in the car badly injured. Huddleston fled the crash site but was apprehended near the scene. Within four feet of the crashed car officers recovered a cocked and loaded pistol, and the face mask was found about 25 feet from the car. Huddleston's wallet which contained his social security card and Tennessee ID only card. The gun used in the robberies was stolen in a home burglary, which Huddleston admitted to committing. (PSR, Paragraphs 7-12).

On October 18, 2011, Judge Bernice B. Donald sentenced Huddleston to 120 months as to count 9, 210 months as to counts 3, 5, 7, concurrent with each other but consecutive to the 84 months imposed for count 2, for a total sentence of 296 months. (R. 105, Page ID 138.)

**BOP's Response to the COVID-19 Pandemic**

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012),

3

available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, BOP has transferred 4,208 inmates to home confinement, which is an increase of [148]% since March 2020. Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/.]

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and

to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

I.      Defendant's Request for a Sentence Reduction

The Defendant attached his request for a reduction in sentence through BOP because of COVID and having asthma to his present motion. He also attached the BOP denial the request. (The R. 217, Attachment A, Page ID 405-407; Attachment B, Page ID 408-411; Attachment C, Page ID413-415). The Defendant is housed At U.S.P. Florence-High.

On May 26, 2020, Defendant filed the present motion with this Court seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A) on the ground that his medical issues make him particularly vulnerable to becoming seriously ill from COVID-19 and that he is more likely to contract COVID-19.

7

**LEGAL FRAMEWORK**

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a

danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[1]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the

---

[1] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

## ARGUMENTS

This Court should deny Defendant's motion with prejudice on either of two independently sufficient grounds. First, Defendant has not established that "extraordinary and compelling reasons" support a sentence reduction; second, Defendant has not met his burden to show that a reduction is warranted in light of the danger that Defendant would pose to the community and the relevant § 3553(a) factors. In addition, this Court lacks statutory authority to grant an alternative request to direct BOP to transfer him to home confinement.

## I  The Court Should Deny The Motion Because Defendant Has Failed to Present Any "Extraordinary and Compelling Reasons" Warranting a Sentence Reduction and Because He Poses a Danger to Public Safety.

First, Defendant has not identified "extraordinary and compelling reasons" for that reduction within the meaning of § 3582(c)(1)(A) and the Sentencing Commission's policy statement. Second, Defendant poses a significant danger to the public and the statutory sentencing factors do not weigh in favor of his release.

### A.  Defendant Has Not Identified "Extraordinary and Compelling Reasons" for a Sentence Reduction.

Defendant's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020);; *see also United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing

Commission as required by § 3582(c)(1)(A).").[2] To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

First, Defendant has not provided sufficient documentation for his asserted medical condition and therefore cannot meet his burden to establish his entitlement to a sentence reduction on that ground alone. With the many attachments to his filing, the Defendant has not provided the Court with any medical records during his time at BOP to corroborate his the severity of his asthma medical conditions, request for treatment, or the lack of treatment. The only medical record attached by the defendant is a form filled out by him alleging severe asthma, and wanting treatment for congested lung and pain, filed on May 14, 2020. (R.217, Page ID 417).  However, the medical staff responds the next day that the facility suppled him two inhalers for asthma, and his documentation states he had asthma as a child that he grew out of. A chest x-ray completed when

---

[2] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

he came into the institution which showed his lungs were clear. The medical staff response also noted he had never made a sick call request nor was he on the list for a sick call. He was instructed to make a sick call request. (R.217, Page ID 418) It should also be noted that in the PSR the Defendant reported he had asthma as a child but was now healthy. No asthma medications were listed in the as being used by the Defendant in the report (PSR, Paragraph 71). Though there are mentions of asthma, the Defendant's motion does not establish to the governments mind that he actually currently suffers from asthma and certainly not that has even moderate or severe asthma or any serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover. The only medical document supplied by the defendant shows he never sought any medical treatment in the approximately 41/2 months he has been there. This does not support a finding of extraordinary and compelling reasons to release the Defendant.

Second, Defendant has not identified a medical condition that falls within one of the categories specified in the policy statement's application note. Defendant's asserted condition does not itself rise to the level of severity required under the policy statement. Further, although Defendant has alleged conditions identified by the CDC as increasing a person's risk for developing serious illness from COVID-19, but again has not provided any information that he actually has these conditions or that these conditions are not being treated or managed properly. Without more, the Defendant is asking this Court to speculate as to his condition and provide relief based on a series of unknowns.

For these reasons, Defendant has failed to establish an "extraordinary and compelling reason" for a sentence reduction under § 3582(c). The motion should be denied.

### B. Defendant Still Poses a Significant Danger to the Safety of the Community and the § 3553(A) Factors Strongly Weigh Against His Release.

Alternatively, Defendant's request for a sentence reduction should be denied because he has failed to demonstrate that is not a danger to the safety of the community or otherwise merits release under the § 3553(a) factors.

Defendant is not entitled to relief. This Court must consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community. At present, there is no proof that Defendant's medical condition are not appropriately managed at the facility, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19, and would also act to treat any inmate who does contract COVID-19. The government submits Defendant has not established that he would be less vulnerable to COVID-19 if he were released.

Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

Defendant would pose a danger to public safety if released. This Court should deny a sentence reduction on that basis alone. In addition, the § 3553(a) factors strongly disfavor a sentence reduction. In addition to the violent offenses he is currently incarcerated on, the Defendant had a long and disturbing juvenile criminal history. (PSR, PP 11-15).

The extreme violent nature of the offenses Defendant was convicted are also disturbing as outlined above. In addition, the Defendant and co-defendant led the police on a long and dangerous chase to avoid being arrested. Given the Defendant's convictions for multiple, well planned violent

14

robberies, that involved lives being threatened, shootings, and one victim being struck in the face with a gun, the §3553(a) factors strongly disfavor a sentence reduction. Release from the facility approximately 10 years into a 24 year 6 month sentence would depreciate the seriousness of the offenses and diminish the deterrent value of the original sentence imposed.

## II. This Court Has No Authority to Direct the BOP to Place Defendant in Home Confinement.

If anything can be construed in the Defendant's filings that he is asking this Court, in the alternative, place him in home confinement. That request should be denied because this Court has no authority to direct BOP to place a defendant in home confinement. Rather, such designation decisions are committed solely to BOP's discretion.

Once a sentence is imposed, BOP is solely responsible for determining an inmate's place of incarceration. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. *United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993). Because Defendant's request for home confinement alters only the place of incarceration, not the actual term of incarceration, only BOP may grant or deny his request.

Moreover, there is no constitutional or statutory authority that allows the Court to order home confinement. A prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently

15

extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons."). Following the imposition of sentence, the Court has limited jurisdiction to correct or modify that sentence absent specific circumstances enumerated by Congress in 18 U.S.C. § 3582. *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010) (per curiam). Section 3582(c) contemplates only a reduction in sentence. *See* § 3582(c). But Defendant's request to serve the rest of his term in home confinement, as opposed to prison, works no reduction to his sentence. Home confinement merely permits the inmate to serve out his term of imprisonment at home. Defendant's request for such relief therefore falls outside § 3582(c)'s limited grant of authority to this Court to modify a sentence post-conviction. Because § 3582(c) deprives the Court of jurisdiction to grant home confinement and because Defendant offers no other statutory authority to support his request for such relief, this Court has no authority to act on his request for such relief in this forum.[3]

## CONCLUSION

For these reasons, this Court should deny Defendant's motion for a sentence reduction

Respectfully submitted,

D. MICHAEL DUNAVANT
UNITED STATES ATTORNEY

By: s/Lorraine Craig
Lorraine Craig
Assistant United States Attorney
167 N. Main, Suite 800
Memphis, Tennessee  38103
(901) 544-4231

---

[3] If a court grants a sentence reduction, it may "impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." § 3582(c)(1)(A). In imposing a term of supervised release, the court may impose a period of home confinement as a condition of supervised release, provided that the court finds that home confinement is a "substitute for imprisonment." USSG § 5F1.2; *see* 18 U.S.C. § 3583(d). Alternatively, a court may consider modifying an existing term of supervised release to add a period of home confinement, consistent with USSG § 5F1.2. *See* § 3583(e)(2).

## CERTIFICATE OF SERVICE

I, Lorraine Craig, Assistant United States Attorney for the Western District of Tennessee, hereby certify that a copy of the foregoing has been sent to Defendant via U.S. Mail.

This date: June 17, 2020

By: s/Lorraine Craig
Assistant United States Attorney